**NORTH CHESTNUT HILL NEIGHBORS,**
Appellant

v.

**ZONING BOARD OF ADJUSTMENT OF THE CITY OF PHILADELPHIA and Woodmere Art Museum.**

Commonwealth Court of Pennsylvania.

Argued March 5, 2007.
Decided July 5, 2007.

S. David Fineman, Philadelphia, for appellant.

Cheryl L. Gaston, Philadelphia, for appellees, Zon. Bd. of Adjust. of the City of Phila. and the City of Phila.

Peter F. Kelson, Philadelphia, for appellee, Woodmere Art Museum.

BEFORE: McGINLEY, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge.

OPINION BY Judge FRIEDMAN.

North Chestnut Hill Neighbors (Neighbors) appeal from the June 26, 2006, order of the Court of Common Pleas of Philadel-

phia County (trial court), which affirmed the decision of the Zoning Board of Adjustment of the City of Philadelphia (ZBA) granting the Woodmere Art Museum (Woodmere or Museum) a variance to permit construction of a proposed addition to the Museum. We vacate and remand.

Woodmere, a non-profit cultural institution, is housed in a five-story Victorian mansion situated on approximately five and one-half acres in the Chestnut Hill area of Philadelphia (City). Woodmere has been used as an art museum since 1916, prior to the enactment of the Philadelphia Zoning Code (Zoning Code), and it was opened as a public facility in 1940. The property is located at the corner of Germantown Avenue and Bells Mill Road and currently is zoned R–1 Residential, where, pursuant to section 14–205 of the Zoning Code, only single-family detached residential use is permitted. Previously, Woodmere has applied for, and received, several variances related to its operation as an art museum.[1]

On February 26, 2004, Woodmere submitted an application to the Department of Licenses and Inspections (L & I), seeking a permit to build: a two-story addition with cellar for use as an art museum on the first and second floor, with art storage and maintenance in the cellar; a one-story addition for use as an accessory mechanical room for erection of an oil tank; reconfiguration of the private parking lot with a new total of 82 spaces; and a retail gift shop, all as part of the existing Museum with accessory office, instructional classes and an accessory storage shed. (ZBA's Findings of Fact, No. 1; R.R. at 8a.) On March 7, 2004, L & I refused to issue the permit, explaining that the requested uses are not permitted in the R–1 District but are extensions of uses previously approved by the ZBA that also require the ZBA's approval. (ZBA's Findings of Fact, No. 2; R.R. at 9a.)

On March 10, 2004, Woodmere filed an appeal from L & I's refusal, arguing that the proposed expansion satisfies the criteria for the grant of variance relief pursuant to section 14–1802 of the Zoning Code [2]

---

**1.** In 1976, the ZBA granted Woodmere a variance allowing construction of a parking lot to support the Museum's use. *Civera v. Zoning Board of Adjustment,* 9 D. & C.3d 39 (1977), *aff'd,* 39 Pa.Cmwlth. 499, 395 A.2d 700 (1979). Other variances permitting Museum expansion were issued in 1980, 1982 and 2000. (R.R. at 224a.)

**2.** The ZBA is authorized to grant variances from the terms required by the Zoning Code that "will not be contrary to the public interest, where, owing to special conditions, a literal enforcement of the provisions of this Title would result in unnecessary hardship." Zoning Code, § 14–1801(1)(c). Section 14–1802 of the Zoning Code lists the criteria to be considered by the ZBA in granting a variance under section 14–1801(1)(c). In relevant part, those criteria are:

 (a) that because of the particular physical surrounding, shape, or topographical conditions of the specific *structure* or land involved, a literal enforcement of the pro-

visions of this Title would result in unnecessary hardship;

(b) that the conditions [on] which the appeal for a variance is [sic] based are unique to the property for which the variance is sought;

(c) that the variance will not substantially or permanently injure the appropriate use of adjacent conforming property;

(d) that the special conditions or circumstances forming the basis for the variance did not result from the actions of the applicant;

(e) that the grant of the variance will not substantially increase congestion in the public streets;

. . .

(i) that the grant of the variance will not adversely affect transportation or unduly burden water, sewer, school, park or other public facilities;

(j) that the grant of the variance will not adversely affect the public health, safety or general welfare;

and constitutes a reasonable modification of prior ZBA approvals. (R.R. at 10a.) Neighbors opposed the grant of the variance,[3] (*see* R.R. at 98a–104a), and the ZBA held four public hearings on the matter. (ZBA's Findings of Fact, Nos. 3–4.) In its Findings of Fact, the ZBA summarized the testimony of the various witnesses, beginning each summary with the words "the Zoning Board of Adjustment heard and considered" the testimony of the particular witness.[4] However, the ZBA made no *specific* credibility determinations or findings based on any of the summarized testimony. The relevant testimony "heard and considered" by the ZBA includes the following.

Eva Lew, an architect with the firm of Venturi Scott Brown, presented photographs showing that the proposed addition would not be any closer to the property lines than the current 55,000 square-foot building. Lew testified that the trees edging the property would be maintained and new trees would be added to block the view of the building. She explained that the design takes advantage of the topography in order to make the new elements less visible to the surrounding neighbors, and she said that the parking area will be designed so that lighting will point away from neighboring homes. Lew also noted that the neighborhood surrounding the Museum contained several other institutions. (ZBA's Findings of Fact, Nos. 10–11.)

Dr. Michael Schantz, Woodmere's director, testified about Woodmere's mission to foster and promote local arts, and he stated that the Museum is an asset to the community in that it has an exceptional collection and also provides children's and other educational programs. Dr. Schantz testified that, although the Museum currently is accredited by the American Association of Museums, Woodmere's accreditation is in jeopardy because it does not have enough visitor amenities, storage or display space. Dr. Schantz explained that in constructing the addition, the intent is not to provide more visitation or educational facilities but, rather, to better accommodate the Museum's present uses.[5]

---

(k) that the grant of the variance will be in harmony with the spirit and purpose of this Title, and

(*l*) that the grant of the variance will not adversely affect in a substantial manner any area redevelopment plan approved by City Council or the Comprehensive Plan for the City approved by the City Planning Commission.

Zoning Code, § 14–1802(1) (emphasis added).

3. Neighbors are owners of twenty-six homes in the vicinity of Woodmere who incorporated and hired counsel to oppose Woodmere's planned addition.

4. In addition to witness testimony, the ZBA stated that it also heard and considered the representations of Peter Kelson, the attorney for Woodmere, and those of David Fineman, the attorney for Neighbors. Kelson presented a site plan and stated that the Museum is on a lot of about 235,000 square feet, with 437 feet of frontage on Germantown Avenue and 524 feet of frontage on Bells Mill Road. Kelson also stated that the addition will contain 14,-000 square feet and cover approximately 13% of the lot, far less than the 35% coverage permitted in the R–1 District. In addition, parking spaces for the Museum would increase from 78 to 82, and access would remain confined to the existing curb cut on Germantown Avenue. Kelson also presented letters of support from the Chestnut Hill Community Association, District Councilwoman Donna Reed Miller, State Senator Allyson Schwartz and others. (ZBA's Findings of Fact, Nos. 7, 9.) On the other hand, Fineman argued that the Museum could not show a hardship allowing for a variance and that the plan will put a "massive large museum" into a residential area, would not fit in the neighborhood and would overburden the community. (ZBA's Findings of Fact, No. 8.)

5. In fact, Dr. Schantz testified that only about 2,000 square feet of the proposed addition

According to Dr. Schantz, he only expects attendance at the Museum to grow incrementally at a rate of 6% per year, and he stressed that Woodmere has reached an agreement with community representatives to limit the size and number of special rental events at the Museum. Dr. Schantz also testified that storm water runoff from the property is a serious problem that will be addressed and corrected with construction of the addition. Dr. Schantz stated that the Museum currently is involved in a fund drive to raise $20,000,000 for the project and already has received $5,000,000 from the Commonwealth. (ZBA's Findings of Fact, Nos. 12, 18–19, 27.)

Maxine Maddox Dornemann, president of the Chestnut Hill Community Association (CHCA), testified that the CHCA conducted a three-year review of the proposed addition and, on October 13, 2004, reached an agreement with the Museum that accommodated the concerns of neighboring homeowners. (ZBA's Findings of Fact, Nos. 13, 24.)

Adrienne Eiss, a traffic expert, prepared a parking sufficiency and traffic study, in which she concluded that: there would be no difficulty with traffic to and from the Museum; all traffic is confined to the existing curb cut; the existing parking lot is adequate for the Museum; and additional parking can be accommodated for special events. (ZBA's Findings of Fact, Nos. 20–21.)

Jim Brzostowicz, an engineer, prepared a report and storm water management design for the proposed Museum addition. He testified that, after construction of the addition, there would be substantially less water runoff and no negative impact to adjacent properties. Brzostowicz agreed that maintenance of the runoff system would be required after construction and that this maintenance would be have to be outsourced. He noted that the plans were approved by the City Water Department and the City Planning Commission. (ZBA's Findings of Fact, No. 22.)

Robert Venturi, the architect for the project, testified that the addition was designed to be complementary to, and compatible with, the existing building and the surrounding neighborhood residences. He also noted that the addition would be devoted to both art and back-up functions. (ZBA's Findings of Fact, Nos. 23.)

Larry S. Waetzman, a land planner retained by Neighbors, presented an aerial photograph of the neighborhood, and counsel for Neighbors read from a 1977 trial court decision about traffic safety issues at the intersection of Germantown Avenue and Bells Mill Road. According to Waetzman, there are 15,500 vehicles per day passing through that intersection; the project will impact on the quiet nature of the residential neighborhood; the parking plan for the addition does not comply with the Zoning Code, which he says requires at least 64 spaces for the addition alone and 183 spaces for the entire building; the plan for overflow parking is chaotic; the headlights from the new parking area will shine into adjacent residences; and the overflow parking will impact nearby residences. However, on cross-examination, Waetzman acknowledged that he did not speak to anyone about the actual parking or traffic flow needs of the Museum but based his report solely on his interpretation of the Zoning Code. He admitted that the Zoning Code section he relied on might

would be used for public gallery space; the remaining square footage would be dedicated to "back-of-house" uses that do not exist in the existing mansion, such as rooms for storage and preservation of archival material, meeting and conference rooms and needed toilet facilities. (R.R. at 306a–10a.)

be inapplicable, but he would not retract his opinion that the parking was inadequate. Waetzman refused to concede that a large buffer separates the Museum from the nearest residence or that trees would be preserved, and he admitted that he is not a civil engineer and is unaware of the storm water issues. (ZBA's Findings of Fact, Nos. 28–29.)

Alexander Messinger, a professor of architecture and interior design, testified on behalf of Neighbors and presented prepared drawings depicting how the parking lights would affect certain residences near the Museum. However, counsel for the Museum then introduced a new landscaping plan designed to buffer the effect of headlights from cars in the Museum parking lot. On cross-examination, Messinger conceded that he is not a landscape architect, and he testified that only three houses would be affected by the lights, with some of the impact on the building and not the windows. Messinger acknowledged that he never designed a museum in the United States and did not consider the requirements of the American professional practice manual related to museum design. He also admitted that his suggestion to build underground parking would require blasting and excavation of bedrock and that the proposed use of sound dampening devices around mechanical equipment during construction would control sound to a level that would have negligible impact on the closest house. Finally, Messinger acknowledged that he was not sympathetic to the Venturi design. (ZBA's Findings of Fact, Nos. 31–32.)

The ZBA also heard the recommendation of the City Planning Commission that reviewed the storm water management plans and, finding them appropriate, supported the grant of the variance. (ZBA's Findings of Fact, No. 33.)

 By unanimous decision dated June 16, 2005, the ZBA granted Woodmere's variance request, subject to provisos that Woodmere meet the fire code, abide by the agreement between Woodmere and the CHCA, retain the size and number of existing curb cuts and make no plans to extend the parking lot to an adjoining parcel. (ZBA's op. at 15.) In doing so, the ZBA held that the applicable variance standards were those set forth in section 14–1802 of the Zoning Code and in *Valley View Civic Association v. Zoning Board of Adjustment*, 501 Pa. 550, 462 A.2d 637 (1983). The ZBA first concluded that Woodmere successfully demonstrated that an unnecessary hardship unique to the property would result if the variance were not granted, relying on Woodmere's evidence that the existing, accredited Museum is an asset to the community which lacks the space and facilities to continue its mission at its present location, and that the proposed plan for the addition will alleviate the storm water runoff problem. Second, the ZBA concluded that Woodmere established that the proposed use of the property is not contrary to the public interest, relying on Woodmere's evidence that the proposed project was extensively reviewed, and is supported, by the CHCA, as well as other civic groups, elected officials and other neighbors and interested parties. Therefore, the ZBA determined that Woodmere met its dual burden of proof and was entitled to variance relief. (ZBA's Conclusions of Law, Nos. 2–6.) Following appeal, the trial court affirmed. Neighbors now appeal to this court.[6]

6. Where, as here, the trial court takes no additional evidence, this court's scope of review is limited to determining whether the ZBA committed an abuse of discretion or an error of law. *Money v. Zoning Hearing Board of Haverford Township*, 755 A.2d 732 (Pa. Cmwlth.2000). A conclusion that the zoning board abused its discretion may be reached

Neighbors argue that the ZBA erred and/or abused its discretion by granting Woodmere's request for a variance to construct the proposed Museum addition because: (1) the ZBA failed to make any findings of fact; (2) the ZBA failed to apply the proper variance standards or consider all the elements required for the grant of a variance; and (3) the ZBA failed to consider certain facts or address and resolve contradictions in the record.[7]

█ Neighbors first maintain that the ZBA violated section 14–1807(3) of the Zoning Code, which requires that the ZBA's record "shall concisely set forth the [ZBA's] findings of fact and conclusions of law showing the basis of the decision appealed from." Neighbors assert that, here, the ZBA simply summarized the testimony in a series of secretarial notes, without indicating what testimony it found to be credible and without discussing the weight attributed to any evidence. Neighbors contend that, as a result, proper appellate review was impossible, leaving the trial court to root through the record and cull from it those "facts" that the ZBA *might* have found to support its conclusions. Thus, according to Neighbors, the trial court did not *review* the record to see whether there was support for the ZBA's findings but, instead, took on the role of fact-finder and *created* a record purposely designed to support the ZBA's conclusions. We disagree with Neighbors' characterization.

Contrary to Neighbors' claim, the ZBA does not provide a mere recitation of all testimony pro and con and then grant the variance without an intimation of its reasoning. *Cf. Jenkintown Towing Service v. Zoning Hearing Board of Upper Moreland Township*, 67 Pa.Cmwlth. 183, 446 A.2d 716 (1982). Rather, in making its findings, the ZBA selects and includes portions of the testimony relating directly to the grant of variance relief. In addition, when summarizing the testimony of Neighbors' expert witnesses Waetzman and Messinger, the ZBA notes that their testimony on cross-examination undermines their opinions, thereby indicating that the ZBA did not attribute great weight to those opinions. (*See* ZBA's Findings of Fact, Nos. 29, 32.) Moreover, in the Conclusions of Law, the ZBA expressly states its bases for determining that Woodmere met its burden of proof.[8] We must agree

only if the zoning board's findings are not supported by substantial evidence. *Id.* Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*

7. Neighbors list seven different issues in the Statement of Questions Involved portion of their brief; however, all these issues may be fairly subsumed within the stated objections.

8. Neighbors maintain that the ZBA improperly included lawyers' statements in its recitation of facts, and Neighbors argue that to the extent the ZBA relied on these statements in reaching its conclusions, the ZBA erred. We agree that unsworn statements of counsel that have no independent basis of support in the record are not competent testimony, *East Norriton Township v. Gill Quarries, Inc.*, 145 Pa.Cmwlth. 574, 604 A.2d 763 (1992), and we recognize that certain of the ZBA's findings include attorney representations. However, we note that, where such is the case, the representations either were identified as "argument," (*see* ZBA's Findings of Fact, Nos. 7, 8), or they had an independent basis of support in the record, (*see* ZBA's Findings of Fact, Nos. 9, 28, 31). Moreover, we note that, in concluding that Woodmere satisfied its burden of proof, the ZBA specifically relied on the following facts: the Museum would be unable to continue its mission in its present building; the proposed plan would alleviate the Museum's storm water runoff problem; the proposed plan arranged for overflow parking; and the proposed plan had the support of the CHCA and other interested parties. (ZBA's Conclusions of Law, Nos. 4–5.) These conclusions do not depend on any statements made by Woodmere's counsel; rather, they are amply supported by the testimony of Dr.

with Neighbors that it is not difficult, either conceptually or practically, for the ZBA to make credibility determinations or to identify specific findings of fact as such. Appellate review always benefits from such clarity, and we urge the ZBA to be more precise in the future. Nevertheless, with a few exceptions noted later in this opinion, we conclude that the format used by the ZBA does not, by itself, render the findings legally inadequate.

Neighbors also argue that the ZBA failed to consider Woodmere's variance request under the appropriate standards. With respect to this argument, the parties argue extensively as to the proper variance standards and governing authority to be applied in this case. Without delving further into their often confusing arguments, we note that the trial court correctly recognized, and the parties essentially agree, that this Philadelphia zoning case is governed by the variance criteria set forth in section 14–1802(1) of the Zoning Code.[9] In fact, in *Civera v. Zoning Board of Adjustment*, 39 Pa.Cmwlth. 499, 395 A.2d 700 (1979), this court adopted the trial court opinion recognizing the need for a variance to expand the Museum, and we affirmed the grant of the variance based on compliance with the criteria set out in section 14–1802 of the Zoning Code. As observed by our supreme court, "[t]he criteria [set forth in section 14–1802(1) ] can be boiled down into three key requirements, that of: 1) unique hardship to the property; 2) no adverse effect on the public health, safety or general welfare; and 3) the variance will represent the minimum variance that will afford relief at the least modification possible." *East Torresdale Civic Association v. Zoning Board of Adjustment of Philadelphia County*, 536 Pa. 322, 324–25, 639 A.2d 446, 447 (1994); *see also Wilson v. Plumstead Township Zoning Hearing Board*, 894 A.2d 845 (Pa.Cmwlth.2006), *appeal granted*, 591 Pa. 678, 916 A.2d 1105 (2006).

■ Neighbors further argue that the ZBA erred or abused its discretion in finding that Woodmere satisfied the elements set forth in section 14–1802(1) of the Zoning Code. As to unnecessary hardship, Neighbors contend that the ZBA did not use the proper standard in considering this element of the variance test but, instead, employed a lower standard based on Woodmere's prior non-conforming use status. According to Neighbors, the ZBA simply concluded that existence of the Museum's prior non-conforming use was sufficient to show that the unique nature of the property necessitated a variance without fully addressing Woodmere's need for the variance or the unique nature of the property. We disagree.

As stated, the ZBA applied the variance criteria in section 14–1802(1) of the Zoning Code to undertake its hardship analysis. The applicable subsections of that Zoning Code section require the ZBA to consider: whether literal enforcement of the provi-

---

Schantz, Brzostowicz, Eiss and Dornemann, respectively.

9. In their respective briefs, Woodmere and the ZBA/City each maintain that the ZBA was correct in utilizing the criteria for a variance set forth in section 14–1802 of the Zoning Code, (Woodmere's brief at 20; ZBA/City's brief at 12, 14–15), and Woodmere contends that Neighbors, instead, want to impose a *heightened* burden by requiring Woodmere to satisfy "the standard for a variance from a nonconforming use." (Woodmere's brief at 32.) In their brief, Neighbors also assert that section 14–1802 of the Zoning Code applies to Woodmere's variance request, (Neighbors' brief at 23, 28–29), but contend that Woodmere, instead, would interpret the Zoning Code "to give *greater leeway* in granting variances to properties that had once been nonconforming uses." (Neighbors' brief at 23, emphasis added.)

sions would result in unnecessary hardship because of particular conditions of the specific *structure* or land involved; that these conditions are unique to the *property*; and that the conditions requiring a variance did not result from any action by the applicant. Section 14–1802(1)(a), (b) and (d). Ultimately, the ZBA concluded that, as an art museum, Woodmere would suffer unnecessary hardship if the variance were not granted based on findings that Woodmere, housed in its existing historic building since 1916, lacks the space and appropriate "back-of-house" facilities to continue its mission as a modern public art museum. The ZBA also found that, due to the topography of the land, the Museum currently suffers from storm water runoff problems that the new construction will alleviate. These findings, which are fully supported by the record, constitute the type of unique hardship identified in the Zoning Code to justify the ZBA's conclusion.[10]

■ Moreover, contrary to Neighbors' contention, the record provides ample support for the ZBA's conclusion that the proposed variance is not detrimental to the public interest. The ZBA recognized that Woodmere has long provided a benefit to the public. Further, the ZBA found that the proposed improvements to the Museum: will be extensively set back from Woodmere's property line and a significant distance from neighboring residences; will

be screened from view of the neighbors; will minimize glare from lights on adjacent residences; will not create traffic or parking problems; will facilitate storm water management; and have the support of the City Water Department, the City Planning Commission and numerous individuals and community organizations, including the CHCA, which entered an agreement with Woodmere to modify the impact of the proposed addition on adjacent property owners. These findings are supported by competent record evidence, and, therefore, the ZBA did not err in its conclusion regarding public interest. *See* section 14–1802(1)(c), (e), (i), and (j), (k) and (*l*).

■ However, we agree with Neighbors' contention that the ZBA erred in failing to make any findings of fact with respect to whether the proposed variance was the minimum that would afford relief. In fact, neither the ZBA nor the trial court even addressed the matter, completely omitting that required element from their analyses.[11]

Although the record contains testimony that Woodmere's present nineteenth-century building does not contain or allow for certain amenities and facilities found in "modern" art museums, the ZBA did not indicate in its summaries of testimony that a thriving institution demands a certain amount of display space, requires storage and meeting areas of a specific size or that

---

**10.** Neighbors argue that the ZBA and the trial court erred in considering the existence of other institutional uses in the area as supporting a finding of hardship for the Museum. In *Valley View*, our supreme court determined that the use of adjacent and surrounding land is a relevant factor in evaluating hardship. However, in that case, a residence was surrounded by commercial and industrial uses that rendered the property without value as a residential use. We agree with Neighbors that the presence of other institutional uses in the North Chestnut Hill area does not provide

any justification for the grant of a variance to Woodmere because, unlike the situation in *Valley View*, the presence of the uses does not impact Woodmere. However, we decline to infer from its brief mention of these other institutional uses that the ZBA gave undue weight to this as a factor in granting variance relief to Woodmere.

**11.** We note that the trial court identifies the minimum variance requirement as part of the variance test, (trial ct. op. at 2), but it fails to address that element in its brief opinion.

an addition smaller than the one proposed will not suffice to meet Woodmere's needs. Therefore, because the ZBA failed to address the "minimum variance" element, and, in fact, did not even recognize this element as part of the criteria for the grant of a variance, we agree with Neighbors that the case must be remanded for consideration of that issue.

We also agree with Neighbors that the ZBA's findings and conclusions are inadequate with regard to the dispute concerning whether the Museum's proposed expansion complies with the parking and screening requirements set forth respectively in sections 14–1402(7) and 14–1402(9) of the Zoning Code. The ZBA's findings do not identify the section of the Zoning Code that controls or the evidence relied upon to determine that the applicable requirements were satisfied. On remand, the ZBA should also make these necessary findings and legal determinations.[12]

In sum, we conclude that, for the most part, the ZBA's findings are sufficient to allow appellate review. As the trial court stated, so long as the record demonstrates that there was no manifest abuse of discretion, the judgment of the ZBA should receive deference. *Silar v. Zoning Board of Adjustment of Spring Garden Township*, 46 Pa.Cmwlth. 340, 407 A.2d 74 (1979). Here, the ZBA's findings on unnecessary hardship and detriment to the public are amply supported by substantial evidence in the record. However, a remand is required so that the ZBA may address and make findings with respect to whether the proposed construction is the minimum that would afford relief to Woodmere and to resolve disputes over alleged Zoning Code noncompliance with regard to parking and screening.

### ORDER

AND NOW, this 5th day of July, 2007, the order of the Court of Common Pleas of Philadelphia County, dated June 26, 2006, is hereby vacated, and the case is remanded for further proceedings in accordance with the foregoing opinion.

Jurisdiction relinquished.

### DISSENTING OPINION BY Judge PELLEGRINI.

Because a grant of a use variance for a use already in existence is an unknown and unauthorized zoning remedy, I respectfully dissent.

Woodmere Art Museum (Museum) is an art museum in a five-story Victorian mansion on five-and-one-half acres in the Chestnut Hill area of Philadelphia. The area is zoned R–1 Residential under the Philadelphia Zoning Code (Zoning Code) in which institutional uses are not allowed. However, because the Museum existed before the Zoning Code's enactment and opened to the public in 1940, normally, it would be considered as a non-conforming use. Over the years, the Museum has received several variances. In 1976, a use variance was sought for the construction of a parking lot. Other "use" variances were granted in 1980, 1982 and 2000 for expansions of the art gallery and the expansions of the Museum's administrative offices with attendant parking. No explanation was given why variances were sought rath-

---

**12.** Neighbors also claim that the ZBA improperly failed to consider or make findings on the Museum's financial viability and Neighbor's evidence that Woodmere would be unable to sustain the additions sought by variance. However, because this is not among the crite- ria set forth in section 14–1802(1) of the Zoning Code, we agree with Woodmere that this is an inappropriate consideration in a variance case. Therefore, we decline to make this a subject for consideration on remand.

er than special exceptions to expand a legal non-conforming use.

The Museum applied for a permit to build a two-story addition with a cellar for use as an art museum on the first and second floor with art storage and maintenance in the cellar; a one-story addition for use as an accessory mechanical room for erection of an oil tank; reconfiguration of the private parking lot with a new total of 82 spaces; and a retail gift shop, all as part of the existing Museum, with an accessory office, instructional classes and an accessory storage shed. The Department of Licenses and Inspection denied the permit because the requested uses were not permitted in the R–1 District as they were extensions of uses previously approved by the zoning board and had to also be approved.

The Museum appealed, contending that the proposed expansion met the requirements for a use variance and was a reasonable modification of its earlier use variances. Even though it was a legal non-conforming use, the use variance was sought because Section 14–104(4)(b) of the Zoning Code provides that a "nonconforming structure or use shall cease to be considered as such whenever it becomes the subject of a variance, granted by the [Board] or ordered by a Court, and its non-conforming status shall not be reinstated thereafter." The North Chestnut Hill Neighbors (Neighbors) opposed the grant of a variance. Following hearings, the zoning board granted the Museum's request for a use variance subject to conditions, and the trial court affirmed on appeal. The Neighbors then appealed to this Court contending that the Museum did not meet the standard for the grant of a use variance.

Holding that the unnecessary hardship requirement was met because of the zoning board's finding that the current Muse-

um suffers from water run-off, lacks "back of the house facilities, and would be not be detrimental to the health welfare and safety of the community as there was not a showing of an adverse impact on the neighboring community," the majority remands to the Board to make findings that the use variance sought was the minimum use variance needed to afford relief. I disagree with the majority because I do not believe use variance standards are applicable, but instead, the expansion of a non-conforming use should apply.

A use variance involves a request to use property for a purpose that is wholly outside zoning regulations because otherwise it would be practically valueless. To show that an unnecessary hardship is needed for the grant of a use variance, one must prove that: (1) the physical features of the property are such that it cannot be used for a permitted purpose; (2) the property can be conformed for a permitted use only at a prohibitive expense; or (3) the property is valueless for any purpose permitted by the zoning ordinance. *SPC Company, Inc. v. Zoning Board of Adjustment of the City of Philadelphia,* 773 A.2d 209 (Pa. Cmwlth.2001). The applicant must show the hardship is unique or peculiar to the property as distinguished from a hardship arising from the impact of zoning regulations on the entire district. *Laurento v. Zoning Hearing Board of the Borough of West Chester,* 162 Pa.Cmwlth. 226, 638 A.2d 437 (1994). Where a condition renders a property almost valueless without the grant of a use variance, unnecessary hardship is established. *Society Created to Reduce Urban Blight v. Zoning Board of Adjustment of the City of Philadelphia,* 787 A.2d 1123 (Pa.Cmwlth.2001).

While there may be some inconvenience resulting if the variance is not granted, there is no showing that the property is almost valueless if the requirements for

the zone are followed because it still could be used for the same purpose that it has been used for before, that is, as a museum. There is also no unique hardship caused by any condition of the land placement that forecloses the property being used as zoned because there is nothing to show that it could not be developed for single-family homes. In recounting these use variance principles, I realize that there is a disconnect with what is being sought because the Museum is not contending that it cannot develop the property as zoned or that it is valueless when it is occupied by a world-class museum. The reason for that disconnect is because what is being sought is not a use variance, but an expansion of a legal non-conforming use, and I believe that is the proper standard to employ in evaluating this application.

Despite Section 14–104(4)(b) of the Zoning Code's provision that a use ceases if a variance has ever been granted, we have continued to apply the expansion of a nonconforming use standard,[1] even though what was requested was a use variance. In *Civera v. Zoning Board of Adjustment*, 39 Pa.Cmwlth. 499, 395 A.2d 700 (1979), involving the 1976 variance for the Museum's parking lot, we stated:

> We affirm on the basis of Judge Gelfand's thorough opinion of June 22, 1977, at No. 4366 July Term, 1976, Court of Common Pleas of Philadelphia County (as yet unreported), **which correctly applied the principles enunciated** in Peirce Appeal, 384 Pa. 100, 119 A.2d 506 (1956) and Mack Zoning Appeal, 384 Pa. 586, 122 A.2d 48 (1958) **to the special circumstances of the off-street parking needs involved in a natural expansion of applicant's nonconforming use.** (Emphasis added.)

Because what is sought here is an expansion of a legal non-conforming use, I would remand for the zoning board to make a finding on the status of the Museum as a non-conforming use, and, if so, to address whether the Museum was entitled to expand its art museum under the natural expansion doctrine.

Accordingly, I respectfully dissent.

---

1. *See Arter v. Philadelphia Zoning Board of Adjustment*, 916 A.2d 1222, Pa.Cmwlth.2007.